UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

In re:                                                              Chapter 11

**983 FULTON LLC,**                                          Case No:  14-12144 (MG)

                                    Debtor.
-----------------------------------------------------------X


### PLAN OF LIQUIDATION OF 983 FULTON LLC


**ROBINSON BROG LEINWAND
GREENE GENOVESE & GLUCK P.C.**
**Attorneys for the Debtor**
875 Third Avenue, 9th Floor
New York, New York 10022
Tel. No.:  212-603-6300

**A. Mitchell Greene, Esq.
Robert M. Sasloff, Esq.
Clement Yee, Esq.**


**Dated:**  New York, New York
           June 22, 2015

**983 FULTON LLC**, the debtor and debtor in possession (the "**Debtor**"), proposes the

following plan of liquidation pursuant to sections 1121(a), 1122 and 1123 of title 11 of the

United States Code.

### ARTICLE 1

### DEFINITIONS

Unless the context otherwise requires (i) the following terms shall have the following

meanings when used in this Plan; (ii) any capitalized term that is used in this Plan and not

defined in this Article 1 but that is defined in the Bankruptcy Code or the Bankruptcy Rules shall

have the meaning set forth therein; (iii) terms stated in the singular shall include the plural and

vice versa; (iv) pronouns stated in the masculine, feminine or neuter gender shall include the

masculine, the feminine and the neuter; (v) all section, article and exhibit references in the Plan

are to the respective section of, article of or exhibit to the Plan; (vi) any reference to a contract,

instrument, release or other agreement or document being in a particular form or on particular

terms and conditions, means that such document shall be substantially in such form or

substantially on such terms and conditions except as stated otherwise in the Plan; (vii) any

reference to an existing document or exhibit filed or to be filed means such document or exhibit,

as it may have been or may be amended, modified or supplemented; (viii) the words "herein",

"hereof", "hereto" or "hereunder" and other words of similar import refer to the Plan in its

entirety rather than to only a particular portion of the Plan; (ix) the rules of construction set forth

in section 102 of the Bankruptcy Code shall govern construction of the Plan; and (x) any

reference contained herein to the Bankruptcy Code, or to any section of the Bankruptcy Code,

refers to the Bankruptcy Code, or such section of the Bankruptcy Code, as it is existing and

effective on the Petition Date, except to the extent, if any, that any post-Petition Date amendment

to the Bankruptcy Code applies retroactively to cases filed on the Petition Date.

      1.1    "**Administrative Bar Date**" means the first Business Day that is at least 60

days after the Closing.

      1.2    "**Administrative Claim**" means a Claim for, or request for payment of, an

Administrative Expense (i) as to which no objection to the allowance thereof has been interposed

within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the

Bankruptcy Rules, or the Bankruptcy Court, or (ii) as to which any objection has been resolved

by a Final Order allowing such claim in whole or in part, to the extent such claim is Allowed.

      1.3    "**Administrative Expense**" means any cost or expense of administration of this

Case, other than Bankruptcy Fees, allowable under sections 503(b), 330 or 331 of the

Bankruptcy Code.

      1.4    "**Administrative Tax Claim**" means an Administrative Claim for a tax due to a

Governmental Unit.

      1.5    "**Allowed Claim**" means a Claim or any portion thereof against the Debtor

that has not been disallowed pursuant to a Final Order and is not a Disputed Claim and (i) with

respect to which a Proof of Claim has been timely filed with the clerk of the Bankruptcy Court

or, (ii) if no Proof of Claim has been filed, that has been or hereafter is listed by the Debtor in the

Schedules as liquidated in amount and not disputed or contingent.

      1.6    "**Allowed … Claim**" means an Allowed Claim of the type described.

      1.7    "**Allowed Interest**" means an Interest in the Debtor that has not been

disallowed and is not a disputed Interest with respect to which (i) a Proof of Interest has been

timely filed or, (ii) if no Proof of Interest has been timely filed, that has been or hereafter is listed by the Debtor in the Schedules.

1.8    **"Available Cash"** means the sum of cash remaining in the Debtor's Estate.

1.9     **"Bankruptcy Code"** means title 11 of the United States Code, as amended from time to time and effective as to cases filed on the Petition Date.

1.10    **"Bankruptcy Court"** means the United States Bankruptcy Court for the Southern District of New York or the United States District Court for the Southern District of New York to the extent it withdraws the reference over all or any portion of this Chapter 11 Case pursuant to section 157(d) of title 28 of the United States Code.

1.11    **"Bankruptcy Fees"** means all fees and charges assessed against the Estate under section 1930 of title 28 of the United States Code.

1.12    **"Bankruptcy Rules"** means (i) the Federal Rules of Bankruptcy Procedure, and (ii) the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York, in effect on the Petition Date, together with any and all amendments and modifications thereto that were subsequently made applicable to this Chapter 11 Case.

1.13    **"Bar Date"** means January 20, 2015.

1.14    **"Break-up Fee"** means $35,000.00, to be paid to the Purchaser, if another buyer successfully closes on a sale of the Property by making a higher and better offer.

1.15    **"Business Day"** means any day other than a Saturday, Sunday, or other day on which commercial banks in New York, New York are authorized or required by law to close, or other Legal Holiday.

{00736685.DOC;1 }{00736685.DOC;1 }4

1.16    "**Case**" means the case under chapter 11 of the Bankruptcy Code commenced in the Bankruptcy Court on the Petition Date and styled *In re 983 Fulton LLC*, Case No. 14-12144 (MG).

1.17    "**Cash**" means, on any Business Day, immediately available funds, in United States dollars, which may be spent or transferred without restriction no later than the next Business Day.

1.18    "**Cash Collateral Order**" means the interim stipulation authorizing the Debtor's usage of cash collateral was entered on December 8, 2014, as amended or extended.

1.19    "**Claim**" means a "claim" against the Debtor or property of the Debtor, as defined in section 101(5) of the Bankruptcy Code.

1.20    "**Class**" means a category of substantially similar Allowed Claims or Allowed Interests as established pursuant to article 3 of the Plan.

1.21    "**Closing**" means the consummation of the sale of the Debtor's Property to the Purchaser by no later than September 7, 2015.

1.22    "**Confirmation**" means the entry of the Confirmation Order on the docket of the Chapter 11 Case.

1.23    "**Confirmation Date**" means the date on which the Confirmation Order is entered by the Bankruptcy Court, provided that the Confirmation Order becomes a Final Order.

1.24    "**Confirmation Order**" means an Order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, in form and substance reasonably satisfactory to the Debtor.

1.25    "**Contract of Sale**" means the contract of sale between the Debtor and GDS Realty Holding Corp, or its assignee or nominee, which is attached hereto as **Exhibit A**.

1.26    "**Creditor**" means a Holder of an Allowed Claim.

1.27    "**Cure Amount**" means any amount required, pursuant to sections 365(b)(1)(A) and 365(b)(1)(B) of the Bankruptcy Code, to cure any defaults or compensate the non-debtor party to any Executory Contract or Unexpired Lease for any actual pecuniary loss resulting from a default in respect of an Executory Contract or Unexpired Lease.

1.28    "**Debtor**" means 983 Fulton LLC, with a mailing address at 225 Broadway, 20th Floor, New York, New York.

1.29    "**Disbursing Agent**" means Robinson Brog Leinwand Greene Genovese & Gluck P.C.

1.30    "**Disclosure Statement**" means the *Disclosure Statement for the Plan of Liquidation of 983 Fulton LLC,* including all exhibits, attachments or amendments thereto, approved by Final Order of the Bankruptcy Court.

1.31    "**Disputed Claim**" means

(a)    any Claim that is listed in the Schedules as disputed, contingent or unliquidated and with respect to which no Proof of Claim has been filed;

(b)    any Claim (including an Administrative Expense Claim), or portion thereof, that has not been disallowed and with respect to which an objection to the allowance thereof, in whole or in part, or the estimation of such Claim, has been filed with the Bankruptcy Court within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, to the extent that any such objection has not been resolved by a Final Order; or

(c)    Until the earlier of (i) the filing of an objection to a Proof of Claim or (ii) the last date to file objections to Claims as established by the Plan or by Final Order, a Claim

represented by a Proof of Claim shall be deemed to be a Disputed Claim in its entirety if, (x) the amount specified in the Proof of Claim exceeds the amount of any corresponding Claim listed in the Schedules; (y) any corresponding Claim listed in the Schedules has been scheduled as disputed, contingent or unliquidated; or (z) no corresponding Claim has been listed in the Schedules.

For the avoidance of doubt, a Disputed Claim shall not include any Claim previously allowed by a Final Order or allowed by the Plan.  The St. James Secured Claim shall not be a Disputed Claim.

1.32    "**Disputed Claim Reserve**" means the segregated account or accounts established by the Disbursing Agent pursuant to section 7.7 of the Plan**.**

1.33    "**Effective Date**" means the first Business Day after which all of the conditions to the Effective Date, specified in Section 11.1 of this Plan have been satisfied.

1.34    "**Estate**" means the Estate of the Debtor created on the Petition Date pursuant to section 541 of the Bankruptcy Code.

1.35    "**Executory Contract**" means an executory contract within the meaning of section 365 of the Bankruptcy Code.

1.36    "**Final Order**" means a judgment, order, ruling or other decree of the Bankruptcy Court (or court of competent jurisdiction) entered by the Clerk on the docket of the Chapter 11 Case (or on the docket of any court of competent jurisdiction) that has not been reversed, vacated or stayed and as to which (i) the time to appeal, petition for *certiorari* proceeding or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* proceeding, or other proceedings for a new trial, reargument or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other

court of competent jurisdiction) shall have been affirmed by the highest court to which such

order was appealed, or *certiorari* shall have been denied or a new trial, reargument or rehearing

shall have been denied or resulted in no modification of such order, and the time to take any

further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have

expired; *provided, however*, that the possibility that a motion under Bankruptcy Rule 9023 or

Bankruptcy Rule 9024, or any analogous rule under the Bankruptcy Rules (or rule of a court of

competent jurisdiction), may be filed relating to such order shall not cause such order not to be a

Final Order.

1.37 "**Holder**" means a Person holding a Claim or Interest.

1.38 "**Interest**" means an equity interest in the Debtor.

1.39 "**Interest Holder**" means the Holder of an Allowed Interest in the Debtor.

1.40 "**Leases**" means any Unexpired Lease of real property between the Debtor
and its Tenants, if any.

1.41 "**Legal Holiday**" means a "Legal Holiday" as that term is defined in
Bankruptcy Rule 9006(a).

1.42 "**Lien**" means any charge against or interest in property to secure payment
of a debt or performance of an obligation.

1.43 "**Liquidating Debtor**" mean the Debtor after the Effective Date.

1.44 "**Other Secured Claims**" means any other Secured Claim against the Property
that is not the St. James Secured Claim or the York City Capital Secured Claim.

1.45 "**Order**" means an order of the Bankruptcy Court.

1.46 "**Person**" means a person as defined in 11 U.S.C. § 101(41).

1.47    "**Petition Date**" means July 23, 2014, the date on which this Case was commenced by the filing of a voluntary petition for relief under Chapter 11 of the Bankruptcy Code by the Debtor.

1.48    "**Plan**" means this *Plan of Liquidation of 983 Fulton LLC,* as it may be amended, supplemented or modified from time to time, including any exhibits or schedules annexed hereto or required to be filed with the Bankruptcy Court pursuant hereto.

1.49    "**Plan Supplement**" means a separate document to be filed with the Bankruptcy Court as a supplement to this Plan no later than five (5) days prior to the Confirmation Date that shall contain the documents necessary to administer this Plan.

1.50    "**Priority Non-Tax Claim**" means that portion of an Allowed Claim, other than a Priority Tax Claim, an Administrative Tax Expense Claim, a Secured Claim, or Bankruptcy Fees, entitled to priority in payment under Bankruptcy Code Section 507(a) or (b).

1.51    "**Priority Tax Claim**" means an Allowed Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

1.52    "**Professional**" means all professionals employed by the Debtor under sections 105, 327 or 330 of the Bankruptcy Code to render professional services in the Chapter 11 Case pursuant to a Final Order.

1.53    "**Professional Fees**" means compensation for services rendered, and reimbursement of expenses incurred, by Professionals prior to the Closing, as allowed and awarded by Final Order following application, in accordance with sections 330 and 331 of the Bankruptcy Code.

1.54    "**Proof of Claim**" means a proof of Claim filed pursuant to section 501 of the Bankruptcy Code and Part III of the Bankruptcy Rules.

1.55   "**Proof of Interest**" means a proof of an Interest filed pursuant to section 501 of the Bankruptcy Code and Part III of the Bankruptcy Rules.

1.56   "**Property**" means the real property and improvements thereon located at 983 Fulton Street, Brooklyn, New York.

1.57   "**Pro Rata**" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Allowed Interests in such Class.

1.58   "**Purchaser**" means GDS Realty Holding Corp or its assignee or nominee.

1.59   "**Sales Proceeds**" means the proceeds paid on account of the sale of the Property pursuant to the Contract of Sale.

1.60   "**Schedules**" mean the schedules of assets and liabilities, any amendments with respect thereto, and the *Statement of Financial Affairs* filed by the Debtor with the Bankruptcy Court in accordance with section 521(1) of the Bankruptcy Code and Rule 1007 of the Bankruptcy Rules and any amendments thereto.

1.61   "**Secured Claim**" means an Allowed Claim, including all amounts, if any, allowed pursuant to section 506(b) of the Bankruptcy Code, to the extent that it is secured by a Lien on Property in which the Estate has an interest or that is subject to set-off under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the Estate's interest in such Property or to the extent of the amount subject to set-off, as applicable, as determined by a Final Order pursuant to section 506(a) of the Bankruptcy Code or as provided for in the Plan.

1.62   "**Secured Creditor**" means the Holder of a Secured Claim.

1.63    "**St. James**" means St. James Lender, LLC, the holder of the St. James Note, St. James Secured Claim and St. James Security Documents, as defined herein.

1.64    "**St. James Note**" means collectively, each and every agreement, promissory note, including any amendment or modification thereof, or allonge thereto, evidencing a claim held by St. James.

1.65    "**St. James Secured Claim**" means the Secured Claim against the Debtor, or the Property, on account of the St. James Note or the St. James Security Documents in the allowed amount of $2,261,102.11.  The St. James Secured Claims shall be an Allowed Claim pursuant to the terms of the Plan and not subject to any claim, defense, offset, setoff or recoupment of the Debtor or Liquidating Debtor under this Plan and shall not be subject to reconsideration under 11 U.S.C. § 502(j).

1.65a    "St. James Payoff Amount" means the sum of $2,037,500.00 to pay to St. James in satisfaction of its lien on the Property.`

1.66    "**St. James Security Documents**" means each and every mortgage, assignment of rents, security agreements, and/or any such other documents granting St. James a lien on the Property to secure the St. James Note.

1.67    "**Tenants**" means all non-Debtor parties to Leases with the Debtor for space on the Property, if any.

1.68    "**Transfer Taxes**" means any and all stamp taxes or similar taxes, if and as applicable and imposed by a Governmental Unit with respect to the transfer of a property or interest therein.

1.69    "**Unsecured Claim**" means a Claim against the Debtor that is not an

Administrative Claim, an Administrative Tax Claim, a Bankruptcy Fee, a Priority Tax Claim, a

Priority Non-Tax Claim, or a Secured Claim.

1.70    "**Unsecured Creditor**" means the Holder of an Unsecured Claim.

1.71    "**Unexpired Lease**" means an unexpired lease within the meaning of section

365 of the Bankruptcy Code.

1.72    "**York City Capital**" means York City Capital Corp., the holder of the York

City Capital Note, York City Capital Secured Claim and York City Capital Security Documents,

as defined herein.

1.73    "**York City Capital Note**" means collectively, each and every agreement,

promissory note, including any amendment or modification thereof, or allonge thereto,

evidencing a claim held by York City Capital.

1.74    "**York City Capital Secured Claim**" means the Secured Claim against the

Debtor, or the Property, on account of the York City Capital Note or the York City Capital

Security Documents in the amount of $330,000.

1.75    "**York City Capital Security Documents**" means each and every mortgage,

assignment of rents, security agreements, and/or any such other documents granting York City

Capital a lien on the Property to secure the York City Capital Note.

## ARTICLE 2

### TREATMENT OF UNCLASSIFIED CLAIMS

Pursuant to section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify

Administrative Claims or Allowed Priority Tax Claims.  Such Claims, to the extent Allowed, shall

receive the treatment provided in this article 2 in full satisfaction, release and discharge thereof.

2.1    **Administrative Bar Date**. Except as otherwise provided in sections 2.2, 2.3 and 2.4 of the Plan, requests for payment of Administrative Expenses must be filed no later than the Administrative Bar Date. Holders of Claims for payment of Administrative Expenses that do not file requests for the payment of Administrative Expenses on or before the Administrative Bar Date shall be forever barred from asserting such Claims against the Debtor or its Property.

2.2    **Professional Compensation and Reimbursement**. Each Person seeking an award by the Bankruptcy Court of Professional Fees shall file its final application for approval of its Professional Fees no later than the Administrative Bar Date. Each Holder of an Allowed Claim for Professional Fees shall receive from the Disbursing Agent, in full satisfaction of such Allowed Claim, Cash in the amount of such Allowed Claim within three days of the entry of a Final Order Allowing such Claim.

2.3    **Administrative Claims**. Subject to the provisions of article 7 of the Plan with respect to Disputed Claims, each Administrative Claim, to the extent not previously paid, shall be paid by the Disbursing Agent in Cash in full on (i) the later of (x) 30 days after the Closing, (y) the date payment of such Claim is due under the terms thereof or applicable law, or (z) three business days after such Claim becomes an Allowed Administrative Claim or (ii) as may be otherwise mutually agreed in writing between the Debtor and the Holder of such Claim; *provided, however,* that any Administrative Claim incurred by the Debtor in the ordinary course of its business shall be paid in full or performed by the Liquidating Debtor in accordance with the terms and conditions of the particular transaction giving rise to such Administrative Claim and any agreements relating thereto.

2.4    **Administrative Tax Claims.** Subject to the provisions of Article 7 of the Plan with respect to Disputed Claims, all allowed Administrative Tax Claims held by Governmental Units shall be paid, in Cash, in full either (i) on or prior to within 30 days of the Closing, or (ii) upon such

other terms as may be agreed to, in writing, between the Debtor and such Governmental Units on or before the Confirmation Date.

    2.5 **Priority Tax Claims.** In full satisfaction, release and discharge of Priority Tax Claims, and except as may be otherwise mutually agreed in writing between the Debtor and such Governmental Units, all allowed Priority Tax Claims shall be paid by the Liquidating Debtor in Cash in full, together with interest within 30 days of the Closing.

    2.6 **Bankruptcy Fees.** All fees and charges assessed against the Debtor under section 1930 of title 28 of the United States Code and any applicable interest thereon shall be paid by the Liquidating Debtor, in full, in Cash within 30 days of the Closing, until the closing, conversion or dismissal of this Case, whichever is earlier.

<div align="center">

**ARTICLE 3**

**CLASSIFICATION OF CLAIMS AND INTERESTS**

</div>

    Except as otherwise provided in article 2, Allowed Claims and Allowed Interests are classified as set forth in this article 3. A Claim or Interest is in a particular Class designated herein only to the extent such Claim or Interest (i) fits within the description of such Class and is in such other and different Class or Classes to the extent that the remainder thereof fits within the description of such other Class or Classes and (ii) has not been paid, released or otherwise satisfied within 30 days of the Closing.

    **Class 1 – Priority Non-Tax Claims.** Class 1 consists of all Priority Non-Tax Claims.

    **Class 2 – St. James Secured Claim.** Class 2 consists of the Allowed St. James Secured Claim.

    **Class 3 – York City Capital Secured Claim.** Class 3 consists of the Allowed York City Capital Secured Claim

    **Class 4 – Other Secured Claims.** Class 4 consists of all Other Allowed Secured Claims.

**Class 5 – Unsecured Claims.**  Class 5 consists of all Allowed Unsecured Claims.

**Class 6 – Interests.**  Class 6 consists of all Interests in the Debtor.

### ARTICLE 4

### TREATMENT OF CLAIMS AND INTERESTS

Allowed Claims in Classes 1-5 and the Interests in Class 6 are unimpaired, are not entitled to vote on the Plan, but are deemed to have accepted the Plan.  The members of each Class shall receive the following treatment under the Plan in full satisfaction, release and discharge thereof.

4.1    **Class 1 – Priority Non-Tax Claims.**  In full satisfaction, release and discharge of the Priority Non-Tax Claims, each Holder of a Priority Non-Tax Claim shall receive, within 30 days of the Closing, whichever is sooner, or as soon as practicable after each such Claim becomes an Allowed Claim, payment from the Disbursing Agent, (i) in Cash in the full amount of its Priority Non-Tax Claim, or (ii) as may be otherwise agreed in writing between the Debtor and the Holder of such Priority Non-Tax Claim.

4.2    **Class 2 – St. James Secured Claim.**  Upon a sale of the Property, in full satisfaction, release and discharge of the St. James Secured Claim, but reserving all claims and causes of action against any other parties (other than the Debtor and the Purchaser), including for any amounts remaining on the St. James Note not paid in full at Closing, St. James shall receive payment from the Disbursing Agent in the amount of $2,037,500 (the "**St. James Payoff Amount**") in Cash at the Closing. To the extent the Property is sold for a price higher than the amount contemplated in the Contract of Sale with the Purchaser, the St. James Payoff Amount shall be increased by 50% of the net proceeds for the increased sales price, less the applicable Break-up Fee.

Notwithstanding anything else in the Disclosure Statement, the Plan, any supplement

thereto, or in any Order confirming the Plan,: (a) St. James shall have a fully Allowed Secured

Claim, in the amount of $2,226,102.11; (b) pre-Closing, the St. James Secured Claim attaches to, is

properly perfected, and is a first priority lien against the Property ; (c) post-Closing, St. James shall

a have lien and  retain its lien on the Sales Proceeds and Available Cash including any deposits

deposited with the Debtor, the Disbursing Agent, or any other party or entity relating to the

Property and its sale, until the St. James Secured Claim is paid in full pursuant to the Plan by receipt

of the St. James Payoff Amount; (d) 50% (50 percent) of the Available Cash will be paid to St.

James for its attorney's fees, in accordance with § 506(b) of the Bankruptcy Code which are

deemed fully allowed without the need for any further application or approval from the Court in the

amount of such payment; (e) the Debtor shall continue making adequate protection payments as

indicated in the Cash Collateral Order until the Closing; (f) no persons or entities (other than the

Debtor) who may be otherwise liable on the St. James Note or any loan documents relating thereto

shall be discharged or released by anything in the Disclosure Statement, Plan, any supplement

thereto or in any order confirming the Plan, and St. James reserves and does not waive any and all

rights against those persons or entities, including, but not limited to any amounts remaining due and

owing on the St. James Note after receipt of the St. James Payoff Amount; (g) St. James shall retain

any and all rights and remedies it has under the St. James Note and related loan documents against

the Debtor and any of its Liens against the Property until it is paid in full pursuant to the terms of

the Plan, provided that even after such payoff it shall retain any and all rights and remedies under

the St. James Note and related loan documents against persons or entities other than the Debtor; and

(h) the Debtor does not have any claims or causes of action against St. James or its predecessors

relating in any way to the St. James Note or any of the underlying loan documents related thereto

or actions of St. James as of the Confirmation Date of this Plan, and therefore: Debtor hereby

releases and forever discharges St. James and St. James's agents, principals, successors, assigns, employees, officers, directors, and attorneys, and each of them, of and from any and all claims, demands, damages, suits, rights, defenses, offsets, or causes of action of every kind and nature that Debtor ever had, may now have, or hereafter can, shall or may have for, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the Confirmation Date, whether known or unknown, contingent or matured, foreseen or unforeseen, asserted or unasserted, including, but not limited to, all claims for compensatory damages, general damages, special damages, consequential damages, incidental damages, punitive damages, attorney fees, and equitable relief.

4.3    **Class 3 – York City Capital Secured Claim**. Upon a sale of the Property and at the Closing, in full satisfaction, release and discharge of the York City Capital Secured Claim, York City Capital shall receive payment from the Disbursing Agent in the amount of $330,000 in Cash.

4.4    **Class 4 – Other Secured Claims.** In full satisfaction, release and discharge of each Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive at the Closing, or as soon as practicable after each such Other Secured Claim becomes an Allowed Claim, (i) Cash, in the full amount of its Claim, or (ii) such other treatment as to which the Debtor and each Holder of such Other Secured Claim shall have agreed upon in writing.

4.5    **Class 5 – Unsecured Claims.** Subject to the provisions of Article 7 of the Plan with respect to Disputed Claims, in full satisfaction, settlement, release and discharge of the Class 5 Unsecured Claims, the Holders of the Class 5 Unsecured Claims against the Debtor shall receive, within 30 days of the Closing, Cash equal to 100% of their Allowed Claim, with interest at the federal judgment rate, from the Disbursing Agent.

4.6     **Class 6 - Interests**.  After all payments are made under the Plan, any excess Cash shall be distributed to the Holders of Interests.

## ARTICLE 5

### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

5.1     **Assumption and Assignments of Executory Contracts and Unexpired Leases.**  On the Closing Date, all Executory Contracts and Unexpired Leases, which are identified in the Contract of Sale, to which Debtor is a party, if any, shall be deemed assumed and assigned to the Purchaser in accordance with Section 365 of the Bankruptcy Code.

5.2     **Assumption Cure Payments**.  Except as otherwise agreed to by the parties, on the Closing, the Liquidating Debtor shall cure any and all undisputed defaults under any Executory Contract or Unexpired Lease that is assumed pursuant to the Plan in accordance with Section 365 of the Bankruptcy Code. Unless the parties to the contract or lease agree otherwise, all disputed defaults that are required to be cured shall be cured by the later to occur of (i) ten (10) days after the entry of a Final Order determining the amount, if any, of the Liquidating Debtor's liability with respect thereto and (ii) the Closing.

5.3     **Rejection Claims.** Allowed Claims arising from the rejection of any Executory Contract or Unexpired Lease of the Debtor shall be treated as an Unsecured Claim**.**

5.4     **Bar to Rejection Claims.**  A Proof of Claim with respect to any Unsecured Claim for damages arising from the rejection of an Executory Contract or Unexpired Leases pursuant to the Plan shall not be timely filed unless it is filed with the Bankruptcy Court and served so that it is received by the Debtor no later than 30 days after the later of (i) the date of entry of a Final Order approving such rejection (unless such Final Order expressly provides a Bar Date with respect to such Claim, in which event no Proof of Claim with respect to such Claim shall be deemed timely filed

unless it is filed with the Bankruptcy Court and served in the manner provided in such Final Order),

or (ii) the Closing. Any such Proof of Claim not timely filed and served shall be forever barred from

assertion and may not be enforced against the Debtor, its successors or their respective properties.

## ARTICLE 6

### IMPLEMENTATION OF THE PLAN

6.1    **Implementation.**  The Debtor shall take all necessary steps, and perform all

necessary acts, to consummate the terms and conditions of the Plan. The Confirmation Order shall

contain appropriate provisions, consistent with section 1142 of the Bankruptcy Code, directing the

Debtor and any other necessary party to perform any act, including the satisfaction of any lien that is

necessary for the consummation of the Plan. Additionally the Confirmation Order shall contain

provisions approving the Contract of Sale pursuant to section 363 of the Bankruptcy Code as well as

approving the sale of the Property as a private sale.

6.2    **Sale of Assets.**  In order to fund distributions under the Plan, the Debtor shall

consummate the Closing and sale of the Property to Purchaser pursuant to Bankruptcy Code section

363 and 1123(a)(5)(D), free and clear of any and all liens, claims, encumbrances, interests, bills or

charges whatsoever, other than the usual and customary utility easements, if any, appearing as of

record or as preserved under this Plan, with the Secured Creditors' liens to attach to the proceeds of

sale in the order of their priority, with St. James' lien first in priority. This sale is not subject to

higher and better offer, however, the Purchaser shall be entitled to a the Break-up Fee of $35,000.00,

if another buyer successfully closes on a sale of the Property, by making a higher and better offer in

the business judgment of the Debtor. In the event a higher and better offer is accepted by the

Debtor, that sale must close by the Closing, unless St. James consents to a later date. If a higher and

better bidder timely closes the purchase on the Property, the Purchaser shall receive their Break-up

Fee at the Closing, and St. James, along with the St. James Payoff Amount, shall receive 50% of the net proceeds of the increased sale price as indicated in Section 4.2 of the Plan, at Closing.

6.3 **Plan Funding**. The Plan shall be funded by the Sales Proceeds, the Debtor's Available Cash on the Closing, including Available Cash and all amounts available in the Debtor's debtor in possession bank account. These funds shall be utilized to satisfy payments due consistent with the terms of this Plan, including claims for attorney's fees by St. James, pursuant to Bankruptcy Code § 506(b).

6.4 **Transfer Taxes.** Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security and the making or delivery of any instrument of transfer in connection with or in furtherance of the Plan, (including any instrument executed in furtherance of the transactions contemplated by the Plan), shall not be subject to tax under any law imposing a stamp tax, real estate Transfer Tax, mortgage recording tax or similar tax, including any such taxes due on the refinancing or sale of the Properties as contemplated by the Plan, and to the extent provided by 1146(a), if any, shall not be subject to any state, local of federal law imposing such tax.

6.5 **Vesting of Assets**. Except as otherwise provided in the Plan, on the Effective Date all of the Debtor's remaining assets (excluding the Property), if any, shall vest in the Liquidating Debtor, free and clear of all Liens, Claims and encumbrances, with the exception of the Secured Claims. After the successful occurrence of the Closing Date, including payment in full to St. James of the St. James Payoff Amount pursuant to the Plan, any and all Liens, Claims and encumbrances that have not been expressly preserved under the Plan shall be deemed extinguished as of such date. Following the Effective Date, the Liquidating Debtor may operate, buy, use, acquire, and dispose of the property of the Estate in accordance with the terms of the Cash Collateral Order

until such time as the Holders of Secured Claims are paid in accordance with the terms of the Plan, and may settle and compromise any claims, interests and causes of action in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules, until the Liquidating Debtor is dissolved.

### 6.6    Execution of Documents.

(a)    On the Effective Date, the Liquidating Debtor, and any necessary party thereto, shall execute, release and deliver all documents reasonably necessary to consummate the transactions contemplated by the terms and conditions of the Plan, provided that St. James' only obligation shall be to execute any necessary release documents if necessary releasing its Liens on the Property after it receives payment in full pursuant to the terms of the Plan The plan Conformation Order and any sale order will provide for the Closing to be free and clear of any and all liens claims and encumbrances on the Property.

(b)    Pursuant to sections 105, 1141(c) and 1142(b) of the Bankruptcy Code, the Debtor shall be authorized to execute, in the name of any necessary party any estoppel certificate, or any notice of satisfaction, release or discharge of any Lien, Claim or encumbrance (including, any Lien, Claim or encumbrance that is to be released and satisfied upon the Debtor's compliance with the provisions of article 4 of the Plan) not expressly preserved in the Plan and deliver such notices to any and all federal, state and local governmental agencies or departments for filing and recordation, and the Confirmation Order shall expressly so provide, that St. James Liens on the Property shall only be released after it receives payment in full of the St. James Payoff Amount pursuant to the terms of the Plan.

### 6.7    Filing of Documents.    Pursuant to sections 105, 1141(c) and 1142(b) of the Bankruptcy Code, each and every federal, state and local governmental agency or department, shall

be directed to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transactions contemplated by the Plan, and any and all notices of satisfaction, release or discharge or assignment of any Lien, Claim or encumbrance not expressly preserved by the Plan, provided that St. James' liens on the Property shall only be released after it receives payment in full of the St. James Payoff Amount pursuant to the terms of the Plan.

6.8    **Preservation of Rights of Action.**

(a) Except as otherwise provided in the Plan, or in any contract, instrument, release or other agreement entered into in connection with the Plan, the Liquidating Debtor shall retain any claims, rights and causes of action (i) arising under sections 510 and 544 through 550 of the Bankruptcy Code or (ii) belonging to the Debtor as of the Petition Date, or the Estate of the Debtor, and arising under any provision of state or federal law, or any theory of statutory or common law or equity.

(b)    Any recovery received by the Liquidating Debtor through the prosecution, settlement or collection of any such claim, right or cause of action, shall be retained by the Liquidating Debtor following the satisfaction of all other Allowed Claims under the terms of the Plan.

(c)    Notwithstanding any provision of the Plan to the contrary, definitions and descriptions contained herein respecting pre-Petition Date documents, agreements or claims are provided solely for the purpose of identification and classification thereof and do not constitute an admission by the Debtor of the existence, validity allowance, or amount of any such claim, document or agreement.  The Debtor and the Liquidating Debtor expressly reserve the right to challenge the existence, validity, allowance, or amount of any such claim, document or agreement.

6.9    **Post-Confirmation Management and Compensation.**  The Interest Holders of the Debtor have agreed that the Liquidating Debtor will be managed by the Interest Holders until the Debtor is dissolved.  The Debtor will continue in existence post-confirmation as the Liquidating Debtor temporarily, provided, however, that the Liquidating Debtor shall take such steps as are necessary to dissolve its existence in accordance with applicable non-bankruptcy law as soon as practicable after all distributions are made and claims objections are prosecuted under this Plan. Under no circumstances shall the Debtor engage in business other than related to the wind down of the Debtor after confirmation of the Plan.

## ARTICLE 7

### PROVISIONS GOVERNING DISTRIBUTIONS

7.1    **Disbursing Agent.**  The Disbursing Agent shall distribute all Cash or other property to be distributed under the Plan and may employ or contract such third parties as may be necessary to assist in or perform the distribution of Cash or other property under the Plan.  Pending the final distribution of all sums distributable under the terms of the Plan (including the delivery to the Liquidating Debtor of unclaimed distributions pursuant to section 7.14 of the Plan), the Disbursing Agent shall have full authority to sign checks on any bank account of the Liquidating Debtor to the extent necessary to make any payment or distribution contemplated by the Plan.

7.2    **Timing of Distributions Under the Plan.** Subject to sections 7.6 and 7.8 of the Plan, any payments, distributions or other performance to be made pursuant to the Plan on account of any Disputed Claim, shall be deemed to be timely made if made on or within five days following the later of (i) the expiration of any applicable objection deadline with respect to such Disputed Claim or (ii) such other times provided in the Plan.  All Secured Claims shall be paid at the Closing.

7.3    **Method of Payment.**  Unless otherwise expressly agreed, in writing, all Cash payments to be made pursuant to the Plan shall be made by check drawn on a domestic bank.

7.4    **Claims Objection Deadline.**  Unless otherwise ordered by the Bankruptcy Court for cause, objections to the allowance of any Claim may be filed no later than the later to occur of (i) 60 days after the Effective Date or (ii) 60 days after the date proof of such Claim or Interest or a request for payment of such Claim is filed. Until the earlier of (i) the filing of an objection to a Proof of Claim or (ii) the last date to file objections to Claims as established by the Plan or by Final Order, Claims shall be deemed to be Disputed in their entirety if, (i) the amount specified in a Proof of Claim exceeds the amount of any corresponding Claim listed in the Schedules; (ii) any corresponding Claim listed in the Schedules has been scheduled as disputed, contingent or unliquidated; or (iii) no corresponding Claim has been listed in the Schedules.  For the avoidance of doubt, the St. James Secured Claim is an Allowed Claim and shall not be subject to an objection.

7.5    **Prosecution of Objections.**  After the Confirmation Date, only the Liquidating Debtor shall have authority to file, settle, compromise, withdraw or litigate to judgment objections to Disputed Claim.  The Liquidating Debtor may comprise any objections to Disputed Claims without further order of the Court.

7.6    **No Distribution Pending Allowance.**  Notwithstanding any other provision of the Plan, no payment or distribution of any kind shall be made with respect to any portion of a Disputed Claim unless and until all objections to such Claim are resolved by Final Order.

7.7    **Escrow of Cash Distributions.**  (a)  On any date that distributions are to be made under the terms of the Plan, the Liquidating Debtor shall make available any and all funds required under Plan to be disbursed on that date, and the Disbursing Agent shall deposit in one or more segregated accounts, Cash or property equal to 100% of the Cash that would be distributed on such

date on account of Disputed Claims as if each such Disputed Claim were an Allowed Claim but for the pendency of a dispute with respect thereto, including, but not limited to (i) Disputed Claims that may be entitled to treatment as Administrative Claims or as Priority Non-Tax Claims pursuant to sections 503 and 507 of the Bankruptcy Code, (ii) claims of Governmental Units for any tax, (iii) any disputed Cure Amount, and (iv) any amount due but not payable on the Closing, on account of Administrative Claims or claims entitled to priority pursuant to section 503 and 507 of the Bankruptcy Code.  The Disbursing Agent shall also segregate any interest, dividends or other proceeds of such Cash.  Such Cash together with any interest, dividends or proceeds thereof, be held in trust for the benefit of the Holders of all such Disputed Claims pending determination of their entitlement thereto.

(b)    The Liquidating Debtor shall have the right to seek an Order of the Bankruptcy Court, after notice and hearing, estimating or limiting the amount of Cash that must be so deposited on account of any Disputed Claim.  Any Creditor whose Claim is so estimated shall have no recourse to any assets theretofore distributed on account of any Allowed Claim if the Allowed Claim of that Creditor as determined by Final Order exceeds the amount so deposited.  Such Creditor shall have recourse first, to the undistributed assets in the Disputed Claims Reserve (on a Pro Rata basis with other Creditors of the same Class who are similarly situated) that exceed the aggregate amount of all Disputed Claims allowed by Final Order, or not yet resolved, and second any unpaid amount shall be an obligation of the Liquidating Debtor.

(c)    For the avoidance of doubt, St. James Secured Claim shall be paid at the Closing.

7.8    **Distribution After Allowance.**  Within 15 days after the entry of a Final Order resolving an objection to a Disputed Claim, the Disbursing Agent shall distribute all Cash or other

property, including any interest, dividends or proceeds thereof, to which a Holder is then entitled with respect to any formerly Disputed Claim that has become an Allowed Claim.

7.9    **Investment of Segregated Cash.**  To the extent practicable, the Disbursing Agent may invest any Cash segregated on account of a Disputed Claim, disputed Interest, undeliverable distribution, or any proceeds thereof (i) in a manner that will yield a reasonable net return taking into account the safety of the investment or (ii) in any manner permitted by section 345 of the Bankruptcy Code; *provided, however,* that the Disbursing Agent shall be under no obligation to so invest such Cash or proceeds and shall have no liability to any party for any investment made or any omission to invest such Cash or proceeds.  Segregated Cash shall be maintained in an authorized depository.

7.10    **Distribution After Disallowance.**  Subject to section 7.7 of the Plan, the Cash segregated on account of Disputed Claims, including the allocable portion of the net return yielded from any investment thereof, if any, remaining after all Disputed Claims have been resolved by Final Order shall revert to the Liquidating Debtor.

7.11    **Surrender of Instruments; Execution of Satisfactions and Releases.**

(a)  Notwithstanding any other provision of the Plan, no Creditor, with the exception of St. James and York City Capital, that holds a note or other instrument evidencing such Creditor's Claim may receive any distribution with respect to such Claim,  unless and until the original note or other original instrument evidencing such Claim shall have been validly surrendered to the Disbursing Agent at the sole cost and expense of such Creditor.

(b)    Any Cash or property to be distributed pursuant to the Plan on account of any such Claim shall, pending surrender, be treated as an undeliverable distribution pursuant to section 7.13 of the Plan.

(c)       In the event any Creditor is unable to surrender a note or other instrument evidencing a Claim against the Debtor that has been destroyed, lost or stolen, such entity may receive a distribution with respect to such Claim by presenting to the Disbursing Agent, in a form acceptable to the Disbursing Agent:  (i) proof of such entity's title to such Claim; (ii) an affidavit to the effect that the same has been lost and after diligent search cannot be located; and (iii) such indemnification as may be required by the Disbursing Agent and all other entities deemed appropriate by the Disbursing Agent from any loss, action, suit or any claim whatsoever which may be made as a result of such entity's receipt of a distribution under the Plan.

(d)       All questions as to the validity, form or eligibility of any note or other instrument evidencing a Claim so surrendered shall be resolved by Final Order of the Bankruptcy Court.  The Disbursing Agent shall not be under any duty to give notification of defects in such tender or shall incur liability for failure to give notification of such defects.

7.12       **Delivery of Distributions.**  Except as provided in sections 7.13, 7.14 and 7.15 of the Plan, distributions to Holders of Allowed Claims and Allowed Interests shall be made: (1) at the addresses set forth on the respective Proofs of Claim or Proofs of Interests filed by such Holders; (2) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim; or (3) at the address reflected in the Schedules if no Proof of Claim or Proof of Interest is filed and the Disbursing Agent has not received a written notice of a change of address.

7.13       **Undeliverable Distributions.**  (a)  If the distribution to the Holder of any Claim or Interest is returned to the Disbursing Agent as undeliverable, no further distribution shall be made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then current address.  Undeliverable distributions shall remain in the possession of the Disbursing Agent

until the earlier of (i) such time as a distribution becomes deliverable or (ii) such undeliverable distribution becomes an unclaimed distribution pursuant to section 7.14 of the Plan.

(b)    Until such time as an undeliverable distribution becomes an unclaimed distribution pursuant to section 7.14 of the Plan, within 30 days after the end of each calendar quarter following the Closing, the Disbursing Agent shall make distributions of all Cash that has become deliverable during the preceding quarter.  Each such distribution shall include the net return yielded from the investment of any undeliverable Cash, from the date such distribution would have been due had it then been deliverable to the date that such distribution becomes deliverable.

(c)    Nothing contained in the Plan shall require the Liquidating Debtor to attempt to locate any Holder of an Allowed Claim or an Allowed Interest.

7.14    **Unclaimed Distributions.**  Any Cash or other assets to be distributed under the Plan shall revert to the Liquidating Debtor if it is not claimed by the entity entitled thereto before the later of (i) one year after the Closing; (ii) one year after such scheduled payment to such entity under Article 4 of this Plan; or (iii) one year after an Order allowing the Claim of that entity becomes a Final Order, and such entity's claim shall be reduced to zero.

7.15    **Set-offs.**  The Liquidating Debtor, as Disbursing Agent, may, but shall not be required to, set-off against the distributions to be made pursuant to the Plan, the claims, obligations, rights, causes of action and liabilities of any nature that the Liquidating Debtor may hold against the Holder of an Allowed Claim, *provided, however,* that neither the failure to effect such a set-off nor the allowance of any claim hereunder shall constitute a waiver or release by the Liquidating Debtor of any such claims, obligations, rights, causes of action and liabilities that the Debtor (or the Liquidating Debtor) has or may have against such Holder.  To the extent the Liquidating Debtor elects to effectuate a set-off, it shall notify the Holder of the Allowed Claim in writing at least ten

(10) days prior to effectuating the set-off.  To the extent the Holder of an Allowed Claim objects to

the set-off, a written objection shall be provided to the Liquidating Debtor, as Disbursing Agent, no

later than three (3) days prior to the set-off date or the objection shall be waived.  For the avoidance

of doubt, St. James Secured Claim shall not be subject of offset, setoff or recoupment.

<p align="center">ARTICLE 8</p>

<p align="center">INJUNCTION AND EXCULPATION</p>

8.1    **Injunction.**  Except (i) as otherwise provided in the Plan or (ii) in any Final

Order, all persons who have held, hold, or may hold Claims against, or Interests in, the Debtor

that arose before or were held as of the Closing, are permanently enjoined, on and after the

Closing, from the commencement or continuation of any action, the employment of process,

from taking any act to collect, enforce, attach, recover or offset against such claim and taking

any act to create, perfect or enforce any lien or encumbrance against property of the Estate

retained by the Liquidating Debtor or distributed to Creditors under this Plan.  Provided that St.

James, may take such necessary steps to enforce the Plan against the Debtor, if the Debtor does

not honor its obligations under the Plan and St. James may pursue any and all rights it has

against any other entities or persons relating to the St. James Note and related documents, and

such actions are not enjoined by the Plan.

8.2    **Limitation of Liability** Section 1125(e) of the Bankruptcy Code, commonly

referred to as the "safe harbor," protects persons acting in good faith, from civil claims arising in

connection with solicitations of acceptances of plans of reorganization or participating in the

offer, issuance, sale or purchase of a security under the Plan.  Pursuant to section 1125(e), as set

forth in Article 8 of the Plan, neither the Debtor, the Interest Holder (with the exception of Allan

Johnson) nor any of their respective officers, directors, members, general partner, managers or

employees (acting in such capacity), nor any professional person employed by any of them,

including property manager Village Dwellings Inc., if any, (the "**Released Parties**") shall have or

incur any liability to any entity for any action taken or omitted to be taken in connection with or

related to the formulation, preparation, dissemination, Confirmation or consummation of the

Plan, the Disclosure Statement or any contract, instrument, release or other agreement or

document created or entered into, or any other action taken or omitted to be taken in connection

with this case or the Plan except in the case of fraud, gross negligence, willful misconduct,

malpractice, breach of fiduciary duty, criminal conduct, unauthorized use of confidential

information that causes damages, or ultra vires acts. Nothing contained herein shall limit the

liability of the Debtor's professionals pursuant to Rule 1.8(h)(1) of the New York State Rules of

Professional Conduct.  From and after the Closing, a copy of the Confirmation Order and the

Plan shall constitute, and may be submitted as, a complete defense to any claim or liability

released pursuant to Article 8 of the Plan.  Nothing in the Confirmation Order or the Plan shall

prevent St. James from enforcing its rights against the Debtor under the Note, Mortgage and

related loan documents, including the foreclosure of its Liens, if the St. James  Payoff Amount is

not paid as set forth in the Plan.

        8.3    **Release**.  Except as otherwise provided in the Plan, upon the Closing, in

consideration of the Cash and other property to be distributed to or on behalf of the holders of

Claims and Interests under the Plan, the Plan shall be deemed to resolve all disputes and

constitute a settlement and release, between and among the Debtor, on the one hand, and each

Creditor and Interest  Holders (with the exception of Allan Johnson), on the other, from any

claim or liability, whether legal, equitable, contractual, secured, unsecured, liquidated,

unliquidated, disputed, undisputed, matured, unmatured, fixed or contingent, known or unknown,

that the Debtor, its Creditors or Interest Holders (with the exception of Allan Johnson) ever had or now have through the Closing in connection with their Claim or Interests (including, without limitation, any claims the Debtor may assert on its own behalf or on behalf of Creditors or Interest Holders (with the exception of Allan Johnson) pursuant to sections 510 and 542 through 553 of the Bankruptcy Code, any claims Creditors or Interest Holders (with the exception of Allan Johnson) may have asserted derivatively on behalf of the Debtor absent bankruptcy, any claims based on the conduct of the Debtor's business affairs prior or subsequent to the commencement of the Case or any claims based on the negotiation, submission and confirmation of the Plan), provided however that nothing in the Plan or the Confirmation Order shall effect a release of any claim for any debt owed to the United States Government arising under the Internal Revenue Code; any state, city or municipality arising under any state, city or municipal tax code; any environmental laws or any criminal laws of the United States or any state, city or municipality. Nothing in the Confirmation Order or the Plan shall enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceedings against the Released Parties for any claim, suit or action arising under the Internal Revenue Code, any state, city or municipal tax code, the environmental laws or any criminal laws of the United States or any state, city or municipality. Nothing in the Confirmation Order or the Plan shall exculpate any party from any liability to the United States Government or any of its agencies or any state, city or municipality arising under the Internal Revenue Code, any state, city or municipal tax code, the environmental laws or any criminal laws of the United States or any state.

Nothing in the Confirmation Order or the Plan shall prevent St. James from enforcing its rights against the Debtor under the Note, Mortgage and related loan documents,

including the foreclosure of its Liens, if the St. James Secured Claim is not paid as set forth in the Plan.

Notwithstanding anything contained herein, nothing contained in the Plan shall be deemed a release with respect to any claims against any third-parties.

## ARTICLE 9

### MISCELLANEOUS PROVISIONS

9.1 **Orders in Aid of Consummation.** Pursuant to sections 105, 1141, 1142 and 1143 of the Bankruptcy Code, the Bankruptcy Court may enter one or more Orders in aid of Confirmation directing the implementation of matters or actions required by the Plan.

9.2 **Compliance with Tax Requirements.** In connection with the Plan, the Liquidating Debtor (and in its capacity as the Disbursing Agent) shall comply with all withholding and reporting requirements imposed by federal, state and local taxing authorities and distributions under the Plan shall be subject to such withholding and reporting requirements; *provided, however,* that the transfer of any Cash, or other assets or interests hereunder shall not be subject to any federal, state or local tax to the fullest extent provided under section 1146 of the Bankruptcy Code.

9.3 **Due Authorization by Creditors.** Each and every Creditor who accepts the distributions provided for under the Plan warrants that it is the lawful owner of such Claim and is authorized to accept the distributions provided for in the Plan and that there are no outstanding Liens, encumbrances, commitments, agreements, or understandings, express or implied, that may or can in any way defeat or modify the rights released, conveyed or modified by the Plan, or obligations undertaken by such Creditor under the Plan.

9.4 **Amendments.** The Plan may be altered, amended or modified by the Debtor, in writing, signed by the Debtor, at any time before the substantial consummation of the Plan, as

provided in sections 1101 and 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.  Any

substantive modification shall require notice and a hearing before the Bankruptcy Court for approval

of the proposed modification of the Plan. The Liquidating Debtor in its own capacity and as the

Disbursing Agent shall be deemed a Plan proponent for purposes of Section 1127 of the Bankruptcy

Code.

        9.5     **Revocation.** The Debtor may revoke or withdraw the Plan at any time prior to

entry of the Confirmation Order.  If the Plan is revoked or withdrawn or if no Confirmation Order is

entered, the Plan shall be null and void, and nothing contained in the Plan shall (i) constitute a

waiver or release of any Claims by or against, or any Interest in, the Debtor; or (ii) prejudice in any

manner the rights of the Debtor or any other party in any further proceedings involving the Debtor or

its Estate, except that the Debtor's exclusive period within which to file a plan of reorganization

pursuant to Bankruptcy Code § 1121 will be deemed to have terminated as of the date and time the

Plan is revoked or withdrawn.  To the extent the Plan is withdrawn or revoked, the Escrowee is

authorized and directed to immediately return the Downpayment to Purchaser.

        9.6     **Request for Relief Under Section 1129(b).** If the Plan is accepted by one or more,

but not all, impaired Classes of Claims, the Debtor may request confirmation under section 1129(b)

of the Bankruptcy Code of any Class of Claims, subject to any modification of the Plan made

pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

        9.7     **Filing of Additional Documents.** Except as otherwise provided in the Plan, on or

before the Effective Date, the Debtor may file with the Court such agreements and other documents

as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the

Plan, and Debtor shall be responsible for the preparation and filing of any reports necessary until the

entry of a Final Decree.  Debtor shall also pay any fees due the U.S. Trustee's Office until entry of a Final Decree.

9.8 **Section Headings.** The section headings contained in the Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

9.9 **Computation of Time.** In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

9.10 **Successors and Assigns.** The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

9.11 **Notices.** All notices and other communications to be given or made hereunder shall be in writing and shall be deemed to have been given or made when mailed or as otherwise set forth herein:

(a) if to the Debtor, at Robinson Brog Leinwand Greene Genovese & Gluck, P.C., 875 Third Avenue, 9th floor, New York, New York 10022, attn:  A. Mitchell Greene, Esq.;

(b) if to any Creditor or Interest Holder, at (i) the addresses set forth on the respective Proofs of Claim or Proofs of Interests filed by such Holders; (ii) the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim; or (iii) the address reflected in the Schedules if no Proof of Claim or Proof of Interest is filed and the Disbursing Agent has not received a written notice of a change of address;

(c) if to any entity that has filed a notice of appearance, at the addresses set forth on such notice of appearance.

(d)      if to Purchaser, at Sichenzia Ross Friedman Ference LLP

61 Broadway, 32nd Floor, New York, NY  10006, attn:  Ralph Priete, Esq.

9.12    **Governing Law.** Except to the extent that the Bankruptcy Code or

Bankruptcy Rules or other Federal law are applicable, the rights and obligations arising under

the Plan shall be governed by, and construed and enforced in accordance with the laws of the

State of New York without giving effect to the principles of conflict of laws thereof.

9.13    **Other Actions.**  Nothing contained herein shall prevent the Debtor, Interest

Holder, or Creditors from taking such actions as may be reasonably necessary to consummate the

Plan, although such actions may not specifically be provided for within the Plan.

9.14    **Severability.**  In the event any provision of the Plan is determined to be

unenforceable such determination shall in no way limit or affect the enforceability and operative

effect of any or all other provisions of the Plan.

9.15    **Business Day.**  In the event that the Plan requires an act to be performed on a

day that is not a Business Day, such act shall be performed on the first Business Day thereafter.

### ARTICLE 10

### RETENTION OF JURISDICTION

10.1    **Retention of Jurisdiction.**  Notwithstanding the entry of the Confirmation Order or

the occurrence of the Effective Date, until the Case is closed, the Bankruptcy Court shall retain and

have original, but not exclusive, jurisdiction to:

(a)      Insure that the Plan is consummated, and to enter any Order pursuant

to section 1142(b) of the Bankruptcy Code, to compel the Debtor, the Interest Holder and any other

necessary party, to take such action and execute such documents to effectuate the Plan;

(b)       Consider any modification of the Plan proposed pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019;

(c)       Allow, disallow, determine, liquidate, classify or establish the priority, secured or unsecured status of any Claim or Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense, the resolution of any and all objections to the allowance or priority of Claims or Interests, and the resolution of any adversary proceeding;

(d)       Grant or deny any and all applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for any period ending on or before the Closing;

(e)       Resolve any motions pending on the Closing, to assume, assume and assign or reject any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor may be liable and to hear, determine and if necessary, liquidate, any and all Claims arising therefrom;

(f)       Ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished in accordance with the provisions of this Plan;

(g)       Decide or otherwise resolve any and all applications, motions, adversary proceedings, contested or litigated matters, and any other matters or grant or deny any applications involving the Debtor that may be pending on the Effective Date;

(h)       Enter such Orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents created in connection with the Plan or Disclosure Statement or to enforce all orders, judgments, injunctions, and rulings entered in connection with the Case, including, but not limited to any Order necessary to enforce the provisions of article 7 of the Plan;

(i)     Resolve any and all controversies, suits or issues that may arise in connection with the consummation, interpretation or enforcement of the Plan or any entity's obligations incurred in connection with the Plan;

(j)     Modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code, or to modify the Disclosure Statement or any contract, instrument, release or other agreement or document created in connection with the Plan or Disclosure Statement;

(k)     Remedy any defect or omission or reconcile any inconsistency in any Order, the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created in connection with the Plan, to the extent authorized herein or in the Bankruptcy Code;

(l)     Issue any injunctions, enter and implement other Orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan;

(m)     Enter and implement such Orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(n)     Determine any dispute arising under or related to the Plan, including, without limitation, any dispute concerning the scope or effect of any release or discharge provided for by the Plan or the Confirmation Order.

(o)     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or Disclosure Statement; and

(p)     Enter an Order or Final Decree concluding the Case.

10.2    **Post-Closing Jurisdiction.** Notwithstanding the entry of a final decree or an order closing the Case, the Bankruptcy Court shall retain jurisdiction to reopen the Case for the purpose of enforcing, by injunction or otherwise, the terms of the Plan, the Confirmation Order and any final decree, including, without limitation, the enforcement of any rights of the Debtor.

## ARTICLE 11

### CONDITION TO THE EFFECTIVE DATE

11.1    **Conditions Precedent to Effectiveness.** The Plan shall not become effective unless and until it has been confirmed and the following conditions have been satisfied or waived in full:

(a)    The Confirmation Order shall have been entered in this case and no stay or injunction shall be in effect precluding the consummation of the transactions contemplated by this Plan and the Confirmation Order shall not have been modified or vacated on appeal.

**ARTICLE 12**

**CLOSING THE CASE**

12.1    **Substantial Consummation.**  Until the occurrence of the Closing, and substantial

consummation of the Plan, the Liquidating Debtor, its Property and its Creditors shall be subject to

further Orders of the Bankruptcy Court.

12.2    **Closing the Case.**  Upon the substantial consummation of the Plan, the

Liquidating Debtor shall expeditiously move for the entry of a final decree closing the Case and such

other relief as may be just and appropriate.

**Dated:**    New York, New York
        June 22, 2015

**983 FULTON LLC**


By: **/S/    Zalman Skoblo**
        **Zalman Skoblo, President**

**ROBINSON BROG LEINWAND
  GREENE GENOVESE & GLUCK P.C.**
**Attorneys for the Debtor**
875 Third Avenue, 9th Floor
New York, New York 10022
Tel. No.:  (212) 603-6300


By: **/S/A. Mitchell Greene**
        **A. Mitchell Greene**

# Exhibit A

CONTRACT OF SALE--OFFICE, COMMERICAL AND MULTI-FAMILY RESIDENTIAL PREMISES (2000)
This form was originally prepared by the Committee on Real Property of the Association of the Bar of the
City of New York.  This form may have been altered by the user and any such alterations may not be
apparent.  To view or download the original unaltered text of this form and an introduction to this form, visit
the Real Estate Law page at www.abcny.org.

# Contract of Sale—Office, Commercial and Multi-Family Residential Premises

## between

## 983 Fulton LLC ("Seller")

## and

## GDS Realty Holding Corp ("Purchaser")

## Premises:

| | |
|---|---|
| Street Address: | 983 Fulton Street |
| City or Town: | New York |
| County: | Kings |
| State: | New York |

# Contract of Sale—Office, Commercial and Multi-Family Residential Premises

CONTRACT dated as of June    , 2015 between 983 Fulton LLC ("Seller") and GDS Realty Holding LLC ("Purchaser").

Seller and Purchaser hereby covenant and agree as follows:

## Section 1.    Sale of Premises and Acceptable Title

§1.01.    Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, at the price and upon the terms and conditions set forth in this contract:  (a) the parcel of land more particularly described in Schedule A attached hereto ("Land"); (b) all buildings and improvements situated on the Land (collectively, "Building"); (c) all right, title and interest of Seller, if any, in and to the land lying in the bed of any street or highway in front of or adjoining the Land to the center line thereof and to any unpaid award for any taking by condemnation or any damage to the Land by reason of a change of grade of any street or highway; (d) the appurtenances and all the estate and rights of Seller in and to the Land and Building; (e) all right, title and interest of Seller, if any, in and to the fixtures, equipment and other personal property attached or appurtenant to the Building; (f) all easements, rights of way, privileges, appurtenances, air rights, developmental rights, zoning rights and other rights attached to the land and Building and owned by the Seller if any; (collectively, "Premises").  For purposes of this contract, "appurtenances" shall include all right, title and interest of Seller in and to (i) the leases for space in the Building, and all guarantees thereof, as shown on Schedule E attached hereto; (ii) all operating manuals and books, data and records regarding the Land and the Building and its component systems in Seller's possession; (v) all licenses, permits, certificates of occupancy and other approvals issued by any state, federal or local authority relating to the use, maintenance or operation of the Land and the Building to the extent that they may be transferred or assigned; (vi) all warranties or guaranties, if any, applicable to the Building, to the extent such warranties or guaranties are assignable; and (vii) good will relating to or used in connection with the operation of the Land and the Building.  The Premises are located at or known as 983 Fulton Street, Brooklyn, New York.

§1.02.    Seller shall convey and Purchaser shall accept fee simple title to the Premises in accordance with the terms of this contract, subject only to:  (a) the matters set forth in Schedule B attached hereto (collectively, "Permitted Exceptions"); and (b) such other matters as (i) Purchaser's title insurance company shall be willing, without special premium, to omit as exceptions to coverage or to except with insurance against collection out of or enforcement against the Premises and (ii) shall be accepted by any lender described in Section 274-a of the Real Property Law ("Institutional Lender") which has committed in writing to provide mortgage financing to Purchaser for the purchase of the Premises ("Purchaser's Institutional Lender"), except that if such acceptance by Purchaser's Institutional Lender is unreasonably withheld or delayed, such acceptance shall be deemed to have been given.

1

**Section 2.**        **Purchase Price, Acceptable Funds, Existing Mortgages, Purchase Money Mortgage, Escrow of Downpayment and Foreign Persons**

§2.01.    The purchase price ("Purchase Price") to be paid by Purchaser to Seller for the Premises as provided in Schedule C attached hereto is $3,000,000.

§2.02.    All monies payable under this contract, unless otherwise specified in this contract, shall be paid by (a) certified checks of Purchaser or any person making a purchase money loan to Purchaser drawn on any bank or trust company having a banking office in the City of New York and which is a member of the New York Clearing House Association or (b) official bank checks drawn by any such banking institution, payable to the order of Seller, except that uncertified checks of Purchaser payable to the order of Seller up to the amount of $1,000.00 shall be acceptable for sums payable to Seller at the Closing, or (c) with respect to the portion of the Purchase Price payable at the Closing, at Seller's election, by wire transfer of immediately available federal funds to an account designated by Seller not less than three business days prior to the Closing.

§2.03.    Intentionally Omitted.

§2.04.    Intentionally Omitted.

§2.05.    (a)    If the sum paid under paragraph (a) of Schedule C or any other sums paid on account of the Purchase Price prior to the Closing (collectively, "Downpayment") are paid by check or checks drawn to the order of and delivered to Seller's attorney or another escrow agent ("Escrowee"), the Escrowee shall hold the proceeds thereof in escrow in an attorney IOLA maintained at Wells Fargo Bank, N.A. and located at 150 East 42nd Street, 35th Floor, New York, NY 10017, until the Closing or sooner termination of this contract and shall pay over or apply such proceeds in accordance with the terms of this section.   Escrowee need not hold such proceeds in an interest-bearing account, but if any interest is earned thereon, such interest shall be paid to the same party entitled to the escrowed proceeds, and the party receiving such interest shall pay any income taxes thereon.   The tax identification numbers of the parties are either set forth in Schedule D or shall be furnished to Escrowee upon request.   At the Closing, such proceeds and the interest thereon, if any, shall be paid by Escrowee to Seller.   If for any reason the Closing does not occur and either party makes a written demand upon Escrowee for payment of such amount, Escrowee shall give written notice to the other party of such demand.   If Escrowee does not receive a written objection from the other party to the proposed payment within 10 business days after the giving of such notice, Escrowee is hereby authorized to make such payment.   If Escrowee does receive such written objection within such 10 day period or if for any other reason Escrowee in good faith shall elect not to make such payment, Escrowee shall continue to hold such amount until otherwise directed by written instructions from the parties to this contract or a final judgment of a court.   However, Escrowee shall have the right at any time to deposit the escrowed proceeds and interest thereon, if any, with the clerk of the Supreme Court of the county in which the Land is located.   Escrowee shall give written notice of such deposit to Seller and Purchaser.   Upon such deposit Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b)    The parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience, that Escrowee shall not be deemed to be the agent of either of the parties, and that Escrowee shall not be liable to either of the parties for any act or omission on its part unless taken or suffered in bad faith, in willful disregard of this contract or involving gross negligence.  Seller and Purchaser shall jointly and severally indemnify and hold Escrowee harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith, in willful disregard of this contract or involving gross negligence on the part of Escrowee.

(c)    Escrowee has acknowledged agreement to these provisions by signing in the place indicated on the signature page of this contract.

(d)    If Escrowee is Seller's attorney, Escrowee or any member of its firm shall be permitted to act as counsel for Seller in any dispute as to the disbursement of the Downpayment or any other dispute between the parties whether or not Escrowee is in possession of the Downpayment and continues to act as Escrowee.

(e)    Escrowee may act or refrain from acting in respect of any matter referred to in this §2.05 in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from action upon the advice of such counsel.

§2.06.    In the event that Seller is a "foreign person", as defined in Internal Revenue Code Section 1445 and regulations issued thereunder (collectively, the "Code Withholding Section"), or in the event that Seller fails to deliver the certification of non-foreign status required under §10.12(c), or in the event that Purchaser is not entitled under the Code Withholding Section to rely on such certification, Purchaser shall deduct and withhold from the Purchase Price a sum equal to ten percent (10%) thereof and shall at Closing remit the withheld amount with Forms 8288 and 8288A or any successors thereto) to the Internal Revenue Service; and if the cash balance of the Purchase Price payable to Seller at the Closing after deduction of net adjustments, apportionments and credits (if any) to be made or allowed in favor of Seller at the Closing as herein provided is less than ten percent (10%) of the Purchase Price, Purchaser shall have the right to terminate this contract, in which event Seller shall refund the Downpayment to Purchaser and shall reimburse Purchaser for title examination and survey costs as if this contract were terminated pursuant to §13.02.  The right of termination provided for in this §2.06 shall be in addition to and not in limitation of any other rights or remedies available to Purchaser under applicable law.

**Section 3.    The Closing**

§3.01.    Except as otherwise provided in this contract, the closing of title pursuant to this contract ("Closing") shall take place on the scheduled date and time of closing specified in Schedule D (the actual date of the Closing being herein referred to as "Closing Date") at the place specified in Schedule D.

**Section 4.       Representations and Warranties of Seller**

Seller represents and warrants to Purchaser as follows:

§4.01.    Unless otherwise provided in this contract, Seller is the sole owner of the Premises.

§4.02.    Intentionally Omitted.

§4.03.    Intentionally Omitted

§4.04.    Intentionally Omitted.

§4.05.    Intentionally Omitted.

§4.06.    Intentionally Omitted.

§4.07.    Intentionally Omitted

§4.08.    Intentionally Omitted.

§4.09.    Intentionally Omitted.

§4.10.    Intentionally Omitted.

§4.11.    Intentionally Omitted

§4.12.    Intentionally Omitted.

§4.13.    Seller is not a "foreign person" as defined in the Code Withholding Section.

§4.14.    Seller is a New York limited liability company that has been duly organized and is validly and presently existing in good standing under the laws of the state of its formation.

§4.15.    Seller has taken all necessary action to authorize the execution, delivery and performance of this contract and has the power and authority to execute, deliver and perform this contract and consummate the transaction contemplated hereby.  This contract and all obligations of Seller hereunder are the legal, valid and binding obligations of Seller, enforceable in accordance with the terms of this contract, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

§4.16.    Intentionally Omitted.

§4.17.    Intentionally Omitted.

§4.18.    Intentionally Omitted.

4

§4.19.    Intentionally Omitted.

§4.21    Seller has received no written notice of any pending or threatened condemnation or eminent domain proceedings that would affect the Premises.

§4.22    Intentionally Omitted.

§4.23    Intentionally Omitted.

§4.24    Intentionally Omitted.

§4.25    There is a water meter recognized by the Department of Environmental Protection at the Premises. Seller shall be required to obtain a final water meter reading prior to the date of closing and pay all charges as of said date of closing.

§4.26    Intentionally Omitted.

§4.27    Intentionally Omitted.

§4.28    Seller is not a party subject to the withholding requirements of Section 1445 of the Internal Revenue Code or to any other Federal or State withholding requirements.

§4.29    Seller has not transferred or agreed to transfer any development or air rights pertaining to the Premises, and shall not transfer or agree to transfer such rights between the dates of contract and closing.

§4.30    That the Seller has not submitted an offering plan to the Attorney General of the State of New York proposing to convert the Premises to Cooperative or Condominium ownership.

**Section 5.    Acknowledgments, Representations and Warranties of Purchaser**

Purchaser acknowledges that:

§5.01.    Purchaser has inspected the Premises, is fully familiar with the physical condition and state of repair thereof, and, subject to the provisions of §7.01, §8.01, and §9.04, shall accept the Premises "as is" and in their present condition, subject to reasonable use, wear, tear and natural deterioration between now and the Closing Date, without any reduction in the Purchase Price for any change in such condition by reason thereof subsequent to the date of this contract.

Before entering into this contract, Purchaser has made such examination of the Premises, the operation, income and expenses thereof and all other matters affecting or relating to this transaction as Purchaser deemed necessary. In entering into this contract, Purchaser has not been induced by and has not relied upon any representations, warranties or statements, whether

5

express or implied, made by Seller or any agent, employee or other representative of Seller or by any broker or any other person representing or purporting to represent Seller, which are not expressly set forth in this contract, whether or not any such representations, warranties or statements were made in writing or orally.

Purchaser, its employees, agents, servants, representatives and contractors shall have reasonable access to the Property during business hours and upon one (1) prior notice to Seller (by telephonic or electronic mail delivery) (the "Access"). All Access shall be at the sole risk and expense of Purchaser, its employees, agents, servants, representatives and contractors.

Purchaser shall indemnify, defend and hold Seller, and all Sellers' affiliates harmless from and against any and all losses (including reasonable attorneys fees and those fees incurred to enforce this obligation) occurring during or by reason of Purchaser's Access, except to the extent arising from Sellers' negligence and upon completion of its efforts, shall restore all damage to the Property resulting from such due diligence, access or entry. The provisions of this Section shall survive Closing or the cancellation or termination of this Contract.

Purchaser represents and warrants to Seller that:

§5.02.    The funds comprising the Purchase Price to be delivered to Seller in accordance with this contract are not derived from any illegal activity.

§5.03.    Purchaser has taken all necessary action to authorize the execution, delivery and performance of this contract and has the power and authority to execute, deliver and perform this contract and the transaction contemplated hereby. Assuming due authorization, execution and delivery by each other party hereto, this contract and all obligations of Purchaser hereunder are the legal, valid and binding obligations of Purchaser, enforceable in accordance with the terms of this contract, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

§5.04.    The execution and delivery of this contract and the performance of its obligations hereunder by Purchaser will not conflict with any provision of any law or regulation to which Purchaser is subject or any agreement or instrument to which Purchaser is a party or by which it is bound or any order or decree applicable to Purchaser or result in the creation or imposition of any lien on any of Purchaser's assets or property which would materially and adversely affect the ability of Purchaser to carry out the terms of this contract. Purchaser has obtained any consent, approval, authorization or order of any court or governmental agency or body required for the execution, delivery or performance by Purchaser of this contract.

## Section 6.    Seller's Obligations as to Leases

§6.01.    Unless otherwise provided in a schedule attached to this contract, between the date of this contract and the Closing, Seller shall not, without Purchaser's prior written consent, which consent may be withheld in Purchaser's sole discretion:  (a) amend, renew or extend any Lease in any respect; (b) grant a written lease to any tenant occupying space pursuant to a

Tenancy; or (c) terminate any lease or Tenancy except by reason of a default by the tenant thereunder or (d) enter into any new lease or occupancy agreement for any portion of the premises, nor allow any currently unoccupied portion of the premises to become occupied.

§6.02.   Intentionally Omitted.

§6.03.   If any space is vacant on the Closing Date, Purchaser shall accept the Premises subject to such vacancy.  Seller shall not grant any concessions or rent abatements for any period following the Closing without Purchaser's prior written consent.

§6.04.   Seller does not warrant that any particular Lease or Tenancy will be in force or effect at the Closing or that the tenants will have performed their obligations thereunder.  The termination of any Lease or Tenancy prior to the Closing by reason of the tenant's default shall not affect the obligations of Purchaser under this contract in any manner or entitle Purchaser to an abatement of or credit against the Purchase Price or give rise to any other claim on the part of Purchaser.

§6.05. Intentionally Omitted.

Seller represents and warrants to Purchaser that:

§6.06   Intentionally Deleted

§6.07   Intentionally Deleted

§6.08   There is no action presently pending or threatened by any tenant or other occupant against the Seller.

§6.09   That the rent roll attached hereto and made a part hereof is a true and accurate account of the current rents and security deposits for all of the tenants.

§6.10   At the Closing, the Seller shall deliver a letter to the tenants advising Tenant of the sale and directing Tenant to forward all future rent as directed by the Purchaser. The Seller shall transfer the security deposit to the Purchaser or be given a credit to be used towards the Purchase Price.

§6.11   All representations contained in this Section 6 shall survive closing.

## Section 7.   Responsibility for Violations

§7.01.   Purchaser shall take title subject to all notes or notices of violations of law or governmental ordinances, orders or requirements which were noted or issued prior to or after the date of this contract by any governmental department, agency or bureau having jurisdiction as to conditions affecting the Premises which have attached to the Premises prior to the Closing pursuant to the Administrative Code of the City of New York, provided however that Seller shall remain responsible for and shall pay at Closing any and all penalties and/or fines  associated with such violations.

7

§7.02.    All obligations affecting the Premises pursuant to the Administrative Code of the City of New York incurred prior to Closing and payable in money shall be discharged by Seller at or prior to Closing..

§7.03.    Regardless of whether a violation has been noted or issued prior to the date of this contract, Purchaser shall take title subject to any violations which a tenant is required to remove or comply with pursuant to the terms of its lease by reason of such tenant's use or occupancy shall not be an objection to title. Purchaser shall accept the Premises subject to all such violations, and Seller shall be responsible for and shall pay any and all penalties and/or fines associated with such violations.

§7.04.    If required, Seller, upon written request by Purchaser, shall promptly furnish to Purchaser written authorizations to make any necessary searches for the purposes of determining whether notes or notices of violations have been noted or issued with respect to the Premises or liens have attached thereto.

## Section 8.    Destruction, Damage or Condemnation

§8.01.    The provisions of Section 5-1311 of the General Obligations Law shall apply to the sale and purchase provided for in this contract.

## Section 9.    Covenants of Seller

Seller covenants that between the date of this contract and the Closing:

§9.01.    Intentionally Omitted.

§9.02.    Seller shall not modify or amend any Service Contract or enter into any new service contract unless the same is terminable without penalty by the then owner of the Premises upon not more than 30 days' notice.

§9.03.    If an insurance schedule is attached hereto, Seller shall maintain in full force and effect until the Closing the insurance policies described in such schedule or renewals thereof for no more than one year of those expiring before the Closing.

§9.04.    No fixtures, equipment, or personal property included in this sale shall be removed from the Premises unless the same are replaced with similar items of at least equal quality prior to the Closing.

§9.05.    Seller shall not withdraw, settle or otherwise compromise any protest or reduction proceeding affecting real estate taxes assessed against the Premises for any fiscal period in which the Closing is to occur or any subsequent fiscal period without the prior written consent of Purchaser, which consent shall not be unreasonably withheld. Real estate tax refunds and credits received after the Closing Date which are attributable to the fiscal tax year during which the Closing Date occurs shall be apportioned between Seller and Purchaser, after deducting the expenses of collection thereof, which obligation shall survive the Closing.

§9.06.    Seller shall allow Purchaser or Purchaser's representative's access to the Premises, the Leases and other documents required to be delivered under this contract upon reasonable prior notice at reasonable times.

**Section 10.    Seller's Closing Obligations**

At the Closing, Seller shall deliver the following to Purchaser:

§10.01.    A statutory form of bargain and sale deed without covenant against grantor's acts, containing the covenant required by Section 13 of the Lien Law, and properly executed in proper form for recording so as to convey the title required by this contract.

§10.02.    Originals of all leases in Seller's possession.

§10.03.    A schedule of all security deposits and a check or credit to Purchaser in the amount of any cash security deposits, including any interest thereon, held by Seller on the Closing Date or, if held by an Institutional Lender, an assignment to Purchaser and written instructions to the holder of such deposits to transfer the same to Purchaser, and appropriate instruments of transfer or assignment with respect to any security deposits which are other than cash.

§10.04.    A schedule updating the Rent Schedule and setting forth all arrears in rents and all prepayments of rents.

§10.05.    All Service Contracts initialed by Purchaser and all others in Seller's possession which are in effect on the Closing Date and which are assignable by Seller.

§10.06.    Deliver to Purchaser an Assignment of Leases agreement assigning all of landlord's rights and obligations and security deposits under the Leases from and after the Closing Date and indemnifying and agreeing to defend Purchaser against any claims made by tenants with respect to any failure to perform any obligations of landlord accruing prior to the Closing Date with respect to security

§10.07.    Deliver to Purchaser a certificate confirming that the warranties and representations of Seller set forth in this contract are true and complete as of the Closing Date..

§10.08.    Intentionally Omitted.

§10.09.    All original insurance policies with respect to which premiums are to be apportioned or, if unobtainable, true copies or certificates thereof.

§10.10.    To the extent they are then in Seller's possession and not posted at the Premises, certificates, licenses, permits, authorizations and approvals issued for or with respect to the Premises by governmental and quasi-governmental authorities having jurisdiction.

§10.11.    Such affidavits as Purchaser's title company shall reasonably require in order to omit from its title insurance policy all exceptions for judgments, bankruptcies or other returns against persons or entities whose names are the same as or similar to Seller's name.

§10.12. (a) Checks to the order of the appropriate officers in payment of all applicable real property transfer taxes and copies of any required tax returns therefor executed by Seller, which checks shall be certified or official bank checks if required by the taxing authority, unless Seller elects to have Purchaser pay any of such taxes and credit Purchaser with the amount thereof, and (b) a certification of non-foreign status, in form required by the Code Withholding Section, signed under penalty of perjury. Seller understands that such certification will be retained by Purchaser and will be made available to the Internal Revenue Service on request.

§10.13. Intentionally Omitted.

§10.14. An original letter, executed by Seller or by its agent, advising the tenants of the sale of the Premises to Purchaser and directing that rents and other payments thereafter be sent to Purchaser or as Purchaser may direct.

§10.15. Intentionally Omitted.

§10.16. Seller will deliver an appropriate non-foreign affidavit pursuant to Section 1445 of the Internal Revenue Code as amended, sufficient to provide an exemption under Subdivision (b) thereof.

§10.17. Possession of the Premises in the condition required by this contract, subject to the Leases and Tenancies, and keys therefor.

§10.18. Intentionally Omitted.

§10.19. Intentionally Omitted.

§10.20. Deliver any other documents required by this contract to be delivered by Seller..

## Section 11.    Purchaser's Closing Obligations

At the Closing, Purchaser shall:

§11.01. Deliver to Seller checks or wire transfer of immediately available federal funds to Seller, in payment of the portion of the Purchase Price payable at the Closing, as adjusted for apportionments under Section 12, plus the amount of escrow deposits, if any, assigned pursuant to §10.08.

§11.02. Intentionally Omitted.

§11.03. Deliver to Seller an agreement indemnifying and agreeing to defend Seller against any claims made by tenants with respect to tenants' security deposits to the extent paid, credited or assigned to Purchaser under §10.03.

§11.04. Cause the deed to be recorded, duly complete all required real property transfer tax returns and cause all such returns and checks in payment of such taxes to be delivered to the appropriate officers promptly after the Closing.

§11.05.   Deliver to Seller an agreement assuming all of landlord's obligations under the Leases from and after the Closing Date and indemnifying and agreeing to defend Seller against any claims made by tenants with respect to any failure to perform such obligations after the Closing Date.

§11.06.   Deliver to Seller a certificate confirming that the warranties and representations of Purchaser set forth in this contract are true and complete as of the Closing Date.

§11.07.   Deliver any other documents required by this contract to be delivered by Purchaser.

**Section 12.    Apportionments**

§12.01.   The following apportionments shall be made between the parties at the Closing as of the close of business on the day prior to the Closing Date:

(a)    prepaid rents and Additional Rents (as defined in §12.03) and revenues, if any, from telephone booths, vending machines and other income-producing agreements;

(b)    intentionally omitted;

(c)    real estate taxes, water charges and sewer rents, if any, on the basis of the fiscal period for which assessed, except that if there is a water meter on the Premise, apportionment at the Closing shall be based on the last available reading, subject to adjustment after the Closing when the next reading is available;

(d)    intentionally omitted;

(e)    value of fuel stored on the Premises, at the price then charged by Seller's supplier, including any taxes;

(f)    charges under transferable Service Contracts or permitted renewals or replacements thereof;

(g)    permitted administrative charges, if any, on tenants' security deposits;

(h)    intentionally omitted;

(i)    insurance premiums on transferable insurance policies listed on a schedule hereto or permitted renewals thereof;

(j)    Intentionally Omitted; and

(k)    any other items listed in Schedule D.

If the Closing shall occur before a new tax rate is fixed, the apportionment of taxes at the Closing shall be upon the basis of the old tax rate for the preceding period applied to latest assessed valuation.  Promptly after the new tax rate is fixed, the apportionment of taxes shall be recomputed.  Any discrepancy resulting from such recomputation and any errors or omissions in

11

computing apportionments at Closing shall be promptly corrected, which obligations shall survive the Closing.

§12.02. If any tenant is in arrears in the payment of rent on the Closing Date, rents received from such tenant after the Closing shall be applied in the following order of priority: (a) first to the month preceding the month in which the Closing occurred; (b) then to the month in which the Closing occurred (c) then to any month or months following the month in which the Closing occurred; and (d) then to the period prior to the month preceding the month in which the Closing occurred. If rents or any portion thereof received by Seller or Purchaser after the Closing are payable to the other party by reason of this allocation, the appropriate sum, less a proportionate share any reasonable attorneys' fees, costs and expenses of collection thereof, shall be promptly paid to the other party, which obligation shall survive the Closing.

§12.03. If any tenants are required to pay percentage rent, escalation charges for real estate taxes, operating expenses, cost-of-living adjustments or other charges of a similar nature ("Additional Rents") and any Additional Rents are collected by Purchaser after the Closing which are attributable in whole or in part to any period prior to the Closing, then Purchaser shall promptly pay to Seller Seller's proportionate share thereof, less a proportionate share of any reasonable attorneys' fees, costs and expenses of collection thereof, if and when the tenant paying the same has made all payments of rent and Additional Rent then due to Purchaser pursuant to the tenant's Lease, which obligation shall survive the Closing. If any tenant is or becomes entitled to a refund of overpayments of Additional Rent which are attributable in whole or in part to any period prior to the Closing, Seller shall pay to Purchaser an amount equal to the amount of such refund attributable to any such period within ten days after notice from Purchaser, which obligation shall survive the Closing.

**Section 13.        Failure of Seller or Purchaser to Perform**

§13.01. Intentionally omitted

§13.02. If Seller shall be unable to convey title to the Premises at the Closing in accordance with the provisions of this contract Purchaser may terminate this contract and the sole liability of Seller shall be to refund the Downpayment to Purchaser. Upon such refund, this contract shall be null and void and the parties hereto shall be relieved of all further obligations and liability other than any arising under Section 14. The foregoing shall not be deemed to be a waiver of Purchaser's right of specific performance in case of Seller's intentional breach.

§13.03. Intentionally Omitted

§13.04. If Purchaser shall default in the performance of its obligation under this contract to purchase the Premises, the sole remedy of Seller shall be to retain the Downpayment as liquidated damages for all loss, damage and expense suffered by Seller, including without limitation the loss of its bargain.

**Section 14.    Broker**

§14.01. If a broker is specified in Schedule D, Seller and Purchaser mutually represent and warrant that such broker is the only broker with whom they have dealt in connection with

this contract and that neither Seller nor Purchaser knows of any other broker who has claimed or may have the right to claim a commission in connection with this transaction, unless otherwise indicated in Schedule D. The commission of such broker shall be paid pursuant to separate agreement by the party specified in Schedule D. If no broker is specified in Schedule D, the parties acknowledge that this contract was brought about by direct negotiation between Seller and Purchaser and that neither Seller nor Purchaser knows of any broker entitled to a commission in connection with this transaction. Unless otherwise provided in Schedule D, Seller and Purchaser shall indemnify and defend each other against any costs, claims or expenses, including attorneys' fees, arising out of the breach on their respective parts of any representations, warranties or agreements contained in this paragraph. The representations and obligations under this paragraph shall survive the Closing or, if the Closing does not occur, the termination of this contract.

**Section 15.    Notices**

§15.01. All notices under this contract shall be in writing and shall be delivered personally or shall be sent by prepaid registered or certified mail, or by prepaid overnight courier with receipt acknowledged, addressed as set forth in Schedule D, or as Seller or Purchaser shall otherwise have given notice as herein provided. The attorneys for the Seller and Purchaser shall be authorized to give and receive notices on behalf of the parties. Notices shall be deemed given three (3) business days after the date mailed or the next business day after delivery by overnight courier.

**Section 16.    Limitations on Survival of Representations, Warranties, Covenants and other Obligations**

§16.01. Except as otherwise provided in this contract, no representations, warranties, covenants or other obligations of Seller set forth in this contract shall survive the Closing, and no action based thereon shall be commenced after the Closing.

§16.02. The delivery of the deed by Seller, and the acceptance thereof by Purchaser, shall be deemed the full performance and discharge of every obligation on the part of Seller to be performed hereunder, except those obligations of Seller which are expressly stated in this contract to survive the Closing.

**Section 17.    Intentionally Omitted.**

**Section 18.    Miscellaneous Provisions**

§18.01. This Contract may be assigned by Purchaser to its assigns or nominee including an affiliate, without the prior written consent of the Seller.


This Contract may be assigned by Purchaser to its assigns or nominee without the prior written consent of the Seller

§18.02.  This contract embodies and constitutes the entire understanding between the parties with respect to the transaction contemplated herein, and all prior agreements, understandings, representations and statements, oral or written, are merged into this contract. Neither this contract nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument signed by the party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

§18.03.  This contract shall be governed by, and construed in accordance with, the law of the State of New York.

§18.04.  The captions in this contract are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this contract or any of the provisions hereof.

§18.05.  This contract shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs or successors and permitted assigns.

§18.06.  This contract shall not be binding or effective until properly executed and delivered by Seller and Purchaser.

§18.07.  As used in this contract, the masculine shall include the feminine and neuter, the singular shall include the plural and the plural shall include the singular, as the context may require.

§18.08.  If the provisions of any schedule or rider to this contract are inconsistent with the provisions of this contract, the provisions of such schedule or rider shall prevail.  Set forth in Schedule D is a list of any and all schedules and riders which are attached hereto but which are not listed in the Table of Contents.

§18.09.  This Contract is to be deemed to have been prepared jointly by the parties hereto, and any uncertainties, or ambiguity existing herein shall not be interpretated against either party, but according to the application of rules of interpretation of contracts, if such uncertainty or ambiguity exists.

§18.10.  Except in connection with an action for specific performance, the parties each agree that neither this Contract nor any memorandum or notice thereof shall be recorded or tendered for recording in any recording office or clerk's office in which the Property is located, or in any other land record office related to the Property.  Purchaser further agrees that if this Contract or any memorandum or short form thereof shall be recorded in any such office by Purchaser, it shall be a material default of Purchaser hereunder and, upon three (3) days notice to Purchaser, Seller may terminate this Contract and such notice, if recorded, shall be deemed sufficient and adequate notice to third parties that this Contract is in no further force and effect.

§18.11.  In the event that Purchaser for any reason files a Notice of Pendency or any memorandum of this Contract, which is hereby acknowledged by Purchaser to be a cloud on Seller's title, it shall be a material default hereunder, unless there is at such time an uncured event of default by Seller for which Purchaser had given Seller written notice, and among other

things, Purchaser shall be liable to Seller for all of Seller's costs and expenses associated with removing such cloud on Seller's title, including, but not limited to, attorney's fees; provided, however, that in no event shall Purchaser be so liable if a final court of competent jurisdiction sustains any of Purchaser's underlying substantive claims against Seller.

§18.12.  Purchaser acknowledges that Purchaser has inspected or shall inspect all aspects of the Property and agrees to take the Premises "as is" as set forth in §5 hereof.  Seller is not liable nor bound in any manner by express or implied warranties, guarantees, promises, statements, representations or information pertaining to the Premises as to the physical condition, environmental conditions, income, expense, operation or to what use the Premises can be applied, including, but not limited to, any matter or thing affecting or relating to the Premises or any personality or fixtures located thereon or appurtenant thereto, except as specifically set forth in this Contract.  Seller is not responsible or in any manner obligated for or by any verbal or written statements, representations, real estate broker's "set-ups" or information pertaining to the Premises furnished by any real estate broker or agent, their employees or any other third person.  Supplementing the foregoing, Purchaser agrees to accept possession of the Premises in its "AS IS" physical condition and "WITH ALL FAULTS" as of the date hereof.  Except as expressly set forth in this Agreement, Seller makes no representation or warranty of any kind or nature whatsoever with respect to the suitability of the Premises for Purchaser's intended use or any other representation of warranty concerning the Premises, including, but not limited to, environmental matters, from and after the date of closing.  Except as expressly set forth in this Contract, Purchaser agrees to assume, from and after the date of closing, any and all liabilities in connection with the current physical condition of the Premises and with any hazardous, dangerous or toxic conditions or substances located or to be found on the Premises or any violation of any Federal, state, city, county, town or municipal laws, statutes, ordinances, rules and regulations relating to toxic wastes or asbestos containing materials or any other hazardous or dangerous substances of any kind or nature whatsoever.  Upon Closing  Purchaser agrees to assume all of the responsibilities imposed by all health, safety, zoning, building and environmental laws, statutes, ordinances, rules and regulations of any Federal, state, county, city, town, municipal or governmental authority having jurisdiction with respect to the Premises.  The provisions of this Section shall survive the delivery of the Deed.

§18.13.  Purchaser represents and warrants that as of the date hereof and as of the Closing Date, the following statements are and shall be true, correct and complete without material misrepresentation or omission: (i) such party is not a Prohibited Person (as defined below), (ii) such party is in compliance with the Anti-Terrorism Laws (as defined below), (iii) such party does not conduct any business or engage in any transaction or dealing with any Prohibited Person, or deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to Executive Order 13224 (as defined below), and (iv) such party has established policies and procedures designed to prevent and detect money laundering, including processes to meet all applicable anti-money laundering requirements of the USA Patriot Act (as defined below).  For purposes of the foregoing representations and warranties: (i) "Anti-Terrorism Laws" are any laws related to terrorism or money laundering, including Executive Order 13224 and the USA Patriot Act, and any regulations promulgated under either of them, (ii) "Executive Order 13224" is defined as Executive Order Number 13224 on Terrorism Financing, effective September 24, 2001, (iii) "Prohibited Person" is defined as (a) a person or entity subject to the provisions of Executive Order 13224; (b) a person or entity

15

owned or controlled by, or acting for or on behalf of, an entity that is subject to the provisions of Executive Order 13224; (c) a person or entity with whom Purchaser or Seller is prohibited from dealing by any of the Anti-Terrorism Laws; (d) a person or entity that commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order 13224; (e) a person or entity that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department's Office of Foreign Assets Control; or (f) a person or entity who is affiliated with a person or entity described in clauses (a) through (e) immediately above, and (g) "USA Patriot Act" is defined as the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, H.R. 3162, Public Law 107-56, as may be amended from time to time.

§18.14  Both Purchaser and Seller hereby irrevocably waive all right to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Contract and both Parties consent to the exclusive jurisdiction of the bankruptcy Court for the Southern District of New York. In connection with any litigation arising out of this Contract, the prevailing party shall be entitled to recover all costs thereof, including, without limitation, reasonable attorneys' fees and disbursements for services rendered in connection with such litigation (including appellate proceedings and post judgment proceedings).

## Section 19.    Bankruptcy Proceeding

The Seller has filed for protection under Chapter 11 of the U.S. Bankruptcy Code in the Bankruptcy Court for the Southern District of New York, Case No. 14-12144 (MG). This Contract is subject to and contingent upon the Bankruptcy Court confirmation pursuant to 11 U.S.C §1129 of a Plan of Reorganization of Seller, which plan shall including a provision approving of and incorporating the sale of the Premises pursuant to this Contract of sale. The Plan shall include a provision that this sale is a transfer pursuant to and in contemplation of the Seller's Chapter 11 Plan of Reorganization and, accordingly, subject to confirmation of the Plan of Reorganization shall not be taxed and/or shall not be subject to any tax under any federal, state, local, municipal or other law imposing a transfer or stamp tax, mortgage tax, or any other law imposing or claiming to impose a transfer or stamp tax, mortgage tax, or any other similar tax in connection with this sale pursuant to §1146(a) of the Bankruptcy Code. This Contract is also subject the incorporation of the Sale Order under the Seller's Plan of Reorganization. "Sale Order" means an order of the Bankruptcy court pursuant to sections 105, 363(b), 363(f), 365 and 1123 (a)(5)(D) of the Bankruptcy Code which order authorizes and approves, inter alia, the sale of the Premises to the Purchaser on the terms and conditions set forth herein, free and clear of all liens claims and encumbrances pursuant to 11 U.S.C. §363(f), except as otherwise set forth in the Permitted Exceptions, and the assumption by the Purchaser, and assignment by Seller, of the assigned contracts, if any, and containing a finding that Purchaser has acted in "good faith" within the meaning of section 363 (m) of the Bankruptcy Code. The Sale Order and the Confirmation Order, including the exhibits thereto, and as the same may be amended, modified supplemented from time to time, shall be in the form and substance acceptable to Purchaser.  If said bankruptcy proceeding is dismissed or approval of a Plan of Reorganization and issuance of the Sale Order is not obtained by September 7, 2015, then Purchaser shall have the option to terminate this Contract with such option to be exercisable by Purchaser by written notice to

Seller's counsel with such written notice to be valid if sent by e-mail or facsimile, whereupon this Contract shall be terminated as of the date of such notice, shall be of no further force or effect, except the deposit on contract shall be returned by **Escrowee** to Purchaser forthwith, and neither party shall have any further obligation or liability to the other.

**Section 20.        Breakup Fee**

Notwithstanding anything to the contrary contained in this Agreement, this sale is not subject to higher and better offers, however, the Purchaser shall be entitled to a breakup fee of $35,000 in the event that another purchaser closes on the sale of the Property, and such breakup fee shall be payable on the date of such closing. Additionally, if the Bankruptcy Court authorizes the sale of the Property to another purchaser, then the Escrowee is authorized and directed to immediately return the Downpayment to Purchaser as of the date of such authorization.

IN WITNESS WHEREOF, the parties hereto have executed this contract as of the date first above written

<div style="margin-left: 40%;">

Seller:

983 Fulton LLC
By: _____
Name:
Its:    Manager


Purchaser:

GDS Realty Holding Corp.
By: _____
Name: _____
Its:    Manager

</div>

**Receipt by Escrowee**

The undersigned Escrowee hereby acknowledges receipt of $100,000 by check subject to collection, to be held in escrow pursuant to §2.05.

<div style="margin-left: 30%;">

Robinson Brog Leinwand Greene Genovese & Gluck P.C.

By: _____        June 22, 2015

</div>

17

**Schedule A**

**DESCRIPTION OF PREMISES**

(to be attached separately and to include tax map designation)

**Schedule B**

**PERMITTED EXCEPTIONS**

1.      Zoning regulations and ordinances.

2.      Consents by the Seller or any former owner of the Premises for the erection of any structure or structures on, under or above any street or streets on which the Premises may abut.

3.      Leases and Tenancies specified in the Rent Schedule.

4.      Unpaid installments of assessments not due and payable on or before the Closing Date.

5.      Intentionally Omitted.

6.      (a)      Rights of utility companies to lay, maintain, install and repair pipes, lines, poles, conduits, cable boxes and related equipment on, over and under the Premises, provided that none of such rights imposes any monetary obligation on the owner of the Premises.

        (b)      Minor encroachments of stoops, areas, cellar steps, trim cornices, lintels, window sills, awnings, canopies, ledges, fences, hedges, coping and retaining walls projecting from the Premises over any street or highway or over any adjoining property and minor encroachments of similar elements projecting from adjoining property over the Premises.

        (c)      Revocability or lack of right to maintain vaults, coal chutes, excavations or sub-surface equipment beyond the line of the Premises.

        (d)      Any state of facts that an accurate survey would disclose provided same does not render title uninsurable at regular rates without premium increase.

        (e)      The present physical condition of the Premises.

        (f)      Minor variations between record lines of the Premises and fences, retaining walls and the like.

        (g)      Minor variations between tax lot and record descriptions.

        (h)      Covenants, restrictions, declarations, reservations, rights, agreements, conditions, consents and easements of record **only if**, they (1) are not violated by the present structures and improvements on the Premises and the present use and occupancy thereof, (2) do not create any affirmative or monetary obligation on the Purchaser.

7.      All present and future building and environmental rules, regulations and advances and any amendments thereto, adopted by any governmental authority now or hereafter having or acquiring jurisdiction.

1

**Schedule C**

**PURCHASE PRICE**

The Purchase Price shall be paid as follows:

| | | |
|---|---|---|
| (a) | By check subject to collection, the receipt of which is hereby acknowledged by Seller: | $ 100,000 |
| (b) | By check or checks delivered to Seller at the Closing in accordance with the provisions of §2.02: | $ 2,900,000 |

**Purchase Price**                                                  $3,000,000

## Schedule D

## MISCELLANEOUS

1.    Title insurer designed by the parties (§1.02):

2.    Seller's tax identification number (§2.05):

4.    Purchaser's tax identification number (§2.05):

5.    Scheduled time and date of Closing (§3.01): within 60 calendar days from the date of the Bankruptcy Court Order confirming the Seller's (as Debtor) plan of reorganization with the Purchaser's right to extend the Closing for an additional thirty (30) days which TIME SHALL BE OF THE ESSENCE.

6.    Place of Closing (§3.01): Offices of Robinson Brog Leinwand Greene Genovese & Gluck P.C., 875 Third Avenue, 9th Floor, New York, New York 10022.

8.    Broker, if any (§14.01):  None

9.    Party to pay broker's commission (§14.01): Not applicable

10.    Address for notices (§15.01):

        If to Seller:


        If to Purchaser:

        GDS Realty Holding Corp.
        224 West 4th Street, 2nd Floor
        New York, NY 10014

1

**Schedule E**

**RENT SCHEDULE**

| Unit # | Tenant | Current Rent | Security Deposit |
|--------|--------|-------------|------------------|
| 1A | Young/Hood | $2,100.00 | $2,100.00 |
| 1B | Emirich/Niemiec | $2,350.00 | $2,350.00 |
| 2A | Koontz/Berman | $1,600.00 | $1,600.00 |
| 2B | Vacant Apartment | $0.00 | $0.00 |
| 3A | Pantano/Leighfield | $2,050.00 | $2,050.00 |
| 3B | De Rothchild | $2,400.00 | $2,400.00 |
| STORE | The Nail Boutique | $3,600.00 | $6,600.00 |
| | Totals: | $14,100.00 | $17,100.00 |